STATE *ex rel.* HARRY LIGHTMAN, COMPLAINANT, APPELLANT,
*v.* CITY OF NASHVILLE, DEFENDANT, APPELLEE.

(*Nashville,* December Term, 1932.)

Opinion filed May 20, 1933.

Norman R. Minick, Elkin Garfinkle, W. E. Norvell, Jr., and W. C. Cherry, for complainant, appellant.

J. Washington Moore, Jack Keefe, Thos. G. Kittrell, Richard P. Dews and Owen Hughes, for defendant, appellee.

Mr. Justice Cook delivered the opinion of the Court.

The relator owns a lot fronting 187 feet on West End Avenue and 104 feet on Park Circle. It is, starting at West End, the first of nine lots between Park Circle and the Tennessee Central Railroad trestle. Across West End fronting relator's lot the land between the railroad and an unnamed street is used for a filling station. To the east the first lot beyond the railroad fronting West End is occupied for an ice house, and beyond across a 15-foot alley a city fire hall is located on a 35-foot lot. The adjacent

50-foot lot is vacant, and beyond that on the lot fronting 82 feet on West End and 65 feet on Fairfax Avenue there is a filling station.

In this environment the relator proposed to erect a business house, and submitted plans and specifications with his application for a permit. The supervisor of buildings refused to grant the permit because violative of regulations made by Ordinance No. 836, known as the Zoning Ordinance.

In a petition alleging the invalidity of the Zoning Ordinance and showing that he had conformed with all the legal rules, regulations, and requirements of the city, the relator applied for the writ of mandamus. At a hearing upon the petition, exhibits, and respondent's return to the alternative writ, the chancellor refused to issue the peremptory writ of mandamus. He held that power to pass Ordinance 836 was conferred by the charter, chapter 125, Private Acts of 1923, section 12, subsections 31 and 40, which grants power.

"To regulate the erection of buildings, billboards, and all other structures, to compel the owners to provide fire escapes for the safety of occupants, and to provide fire districts or zones and building zones; to prohibit, regulate and suppress or provide for the destruction and removal of any house, cistern, well or structure which may be or become dangerous or detrimental to the inhabitants, after due notice, and to provide for a penalty upon failure of the owner, occupant or agent to comply with the requirements provided.

"And to pass all ordinances necessary for the health, convenience, safety and general welfare of the inhabitants of the city, and to carry out the full intent, cor-

porate purposes and meaning of this Act, as fully as if specifically authorized.''

Relator appealed and insists that these sections conveyed no power to impose restraint upon the legitimate use of property, but if so they were withdrawn by the charter amendment, chapter 290, Private Acts of 1925, and in passing Ordinance 836 the city failed to observe the requirements of the charter as amended by the Act of 1925.

It is insisted on behalf of the city that the power to pass Ordinance 836 was granted by the quoted provision of the charter, Act of 1923; that this provision was not repealed by the amending Act of 1925, which merely added to the power already granted by authorizing the city to establish an elaborate and permanent zoning system. It is further insisted that the express power conferred by the Act of 1925 to pass a zoning ordinance was attended by the implied power to enact Ordinance 836 as an emergency measure pending adoption of the comprehensive permanent zoning system.

The power to restrain by local police regulation the property owner's right to pursue plans for buildings and repairs depends upon valid municipal ordinances, authorized by an empowering statute. For the police power belongs to the State, and passes to municipalities and local governing bodies only when and as conveyed by legislative enactment. 6 R. C. L., p. 240, sec. 229; 19 R. C. L., p. 800, sec. 108; *Farmer* v. *Nashville,* 127 Tenn., 516; *Nashville* v. *Link,* 12 Lea, 498; *Long* v. *Taxing District,* 7 Lea, 134; *Raleigh* v. *Daugherty,* 3 Lea, 11.

When the delegation of a police power is relied on by the municipality to support measures that curtail or impair the rights of ownership and use of private prop-

erty, the organic rights to acquire, possess, and enjoy the use of property, and the guarantees of due process of law and equal protection of the laws assured to individuals must be regarded. There must be a valid statute delegating the power, and in determining whether the power was delegated and subsequently exercised by a valid ordinance or regulation the courts have always applied familiar rules of statutory construction.

For a long time regulation of the use of property in municipalities was confined to measures designed to avoid fire hazards, to provide for the safety of buildings, and to prevent or suppress insanitary conditions calculated to affect the health of the community. The police powers delegated for that purpose could not be extended by judicial construction to include esthetic considerations and measures to preserve local residential values under zoning laws such as have been recently sustained as a legislative extension of the police power. Such an Act applicable to Memphis was sustained in our case of *Spencer-Sturla Co.* v. *Memphis,* 155 Tenn., 70.

It is doubtful if section 12, subsections 31 and 40, of the charter Act of 1923, conferred power upon the city to pass Ordinance No. 836. But it is not necessary to rest the determination there. If section 12, subsections 31 and 40, of the charter Act were intended to convey power to zone the City of Nashville and to control the use of private property, that provision was supplanted by the comprehensive zoning amendment to the charter found in chapter 209, Private Acts of 1925.

The amendatory Act prescribes with particularity how the particular power shall be exercised by outlining the procedure through which the city may adopt a zoning system. The amendatory Act became a part of the origi-

nal charter. It covers the entire subject of zoning and it *superseded* the provisions of the original Act, if, as insisted, that Act was intended to confer the power to do city planning and adopt the zoning system. *Melton* v. *State,* 160 Tenn., 273; *Haley* v. *State,* 156 Tenn., 85; *Ferrell* v. *State,* 86 Tenn., 523. Chapter 209, Private Acts of 1925, amended the charter of Nashville so as, among other things, to provide:

"In order to avail itself of the powers conferred herein, the City Council shall first appoint a Commission to be known as the Zoning Commission, to recommend the boundaries of the various original districts and appropriate regulations to be enforced therein. Said Commission shall consist of not less than five, nor more than fifteen citizens of the City of Nashville, who shall be appointed by the Mayor, subject to the approval of the City Council. Members of this Commission shall be appointed to hold office for four years, and all vacancies shall be filled by the Mayor, subject to the approval of the Council. The City Council may, by ordinance, designate the City Planning Commission as the Zoning Commission, if there be such City Planning Commission in existence, such Commission shall, from time to time make tentative reports and hold public hearings thereon at such times and places, and upon such notice as the City Council shall require, before submitting its final report. The City Council shall not determine the boundaries of any district nor impose any regulations with reference thereto (until) after the final report of such zoning commission. No regulations, restrictions or boundaries shall become effective until after a public hearing in relation thereto, at which parties in interest and citizens shall have an opportunity to be heard. At least fifteen days notice of the

time, and place of such hearing shall be published in a paper of general circulation in the City of Nashville."

This provision of the charter is mandatory. 43 C. J., secs. 248, 249. It is made so by the negative words in section 4, which in effect declare that the City Council shall have no authority to determine the boundary of any district or impose any regulations until after the final report of the zoning commission based on public hearings. Statutes prescribing how the delegated police power may be exercised are mandatory and exclusive of other methods. *Huffines* v. *Gold,* 151 Tenn., 583; *Memphis Railway* v. *Rapid Transit Co.,* 138 Tenn., 594; *Railroad* v. *Mayor,* 4 Cold., 406.

It is admitted on the record that these mandatory requirements were not met. There was no public hearing by the zoning commission, and no reports containing a recommendation of boundaries of the various districts, dependent upon environment and suitability of the use to which the property should be devoted, as required by the charter as amended, before passage of Ordinance 836. The ordinance provides:

*"Section* 1.

"That, in order to designate districts and to regulate the locations of dwellings, apartment houses, business, trades and industries and the location of all buildings designed, erected, altered or occupied for specified uses, the City of Nashville is hereby divided into the following districts:

"(1)   Residence A Districts

"(2)   Residence B Districts

"(3)   Commercial Districts

"A District shall be considered as the property abutting on one side of a street between two successive in-

tersecting streets, each greater than twenty feet wide, but not including the side of a corner lot if said corner lot fronts on one of the said successive intersecting streets.

"*Section* 2.

"Be it further enacted, That in a Commercial District any use of property shall be permitted that is allowed within the City of Nashville. A district shall be considered a Commercial District if more than 20 per cent of the frontage of that district is, at the time this ordinance becomes effective, used for any business or industry except farming, truck gardening, nursery, the raising of animals, the conducting of a boarding or lodging house not primarily for transient guests, or other home occupation carried on by a family within its residence.

"*Section* 3.

"Be it further enacted, That in a Residence B District any use of property other than for business or industry shall be permitted. A district shall be considered a Residence B District if more than 20 per cent of the frontage in that district is, at the time this ordinance becomes effective, used for residences each housing three or more families or housekeeping units with independent kitchens, such percentage to include also any commercial use then existing within said district.

"*Section* 4.

"Be it further enacted, That Residence A Districts shall comprise all districts not included in Residence B Districts and Commercial Districts."

Sections 5 and 6 forbid erection of business structures in residence districts, Section 7 authorizes the zoning commission to review the action of the supervisor of

buildings upon application for permits, Section 8 prescribes set-back lines in residence districts, and Section 9 forbids issuance of permits contrary to provisions of the ordinance.

Without regard to location, circumstances, or environment, commercial districts are designated by the ordinance as those having "20 per cent of frontage used for business," and Residence B Districts as those having "20 per cent of frontage used for residences." This fixation of use was made without regard to location and environment, or whether the remaining 80 per cent of frontage was vacant, or if occupied by buildings, without considering their condition and availability for the use required by the ordinance.

The City Council had no authority to enact a permanent zoning ordinance without meeting the requirements of the amendatory Act; and if it could not provide a permanent zoning system without complying with the statute it could not pass Ordinance 836 as an emergency measure. Nothing on the face of the ordinance indicates that it was intended as an emergency measure but, if so, noncompliance with the statute delegating power to zone the city would render such an emergency Act invalid.

Cases referred to by counsel for the city in support of their insistence that the ordinance should be sustained as an emergency measure rest upon judicial conclusions that the power exercised had been delegated to the particular municipality either by statutory enactment or under constitutional provisions.

For the reasons indicated, the decree of the chancellor must be reversed and the peremptory writ of mandamus awarded.